IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DAVID & LIA RENSIN,            )
                               )
        Plaintiffs,            )
                               )
            v.                 )
                               )    1:09cv1391 (JCC)
JUNO-LOUDON, LLC., *et al.*     )
                               )
        Defendants.            )

# M E M O R A N D U M   O P I N I O N

This matter is before the Court on Defendant Ritz-
Carlton Hotel Company LLC's Motion for Partial Summary Judgment.[1]
Plaintiffs, purchasers of several residential real estate lots,
have brought suit against Defendants for rescission and damages
pursuant to the Interstate Land Sales Full Disclosure Act
("ILSFDA" or the "Act") and various related state law claims.
Defendant Ritz-Carlton Hotel Company, LLC. ("Ritz") has moved
for Summary Judgment on Counts II and III, the alleged ILSFDA
violations (15 U.S.C. § 1701 *et seq*.).  At issue on summary
judgment with respect to the ILSFDA claims is whether the Act's
exemption for developments containing less than one hundred lots
applies where, as here, the development contains one hundred and

---

[1] The same issue is presented in Ritz's Motion for Summary Judgment filed in
*Nahigian v. Juno Loudoun, LLC.*, 1:09cv725.  Ritz has waived a hearing on that
motion.  This Court will issue a separate Memorandum Opinion in that case.

sixty-four lots and Defendants purportedly "originally intended" to, though have as of yet failed to, sell half of the these lots as exempted lots through sales to "builders."

For the reasons that follow the "One Hundred Lot Exemption" does not yet apply to this development thus Defendant Ritz's Motion for Partial Summary Judgment as to Counts II and III is denied.

## I. Background

Plaintiffs, David and Lia Rensin, are married and reside in Virginia. (Compl. ¶ 9). Defendant Juno-Loudoun, LLC ("Juno") is a Delaware limited liability company in the business of developing and managing real estate and was a co-developer of the subdivision property once known as The Ritz-Carlton Golf Club, Creighton Farms (the "Development" or "Creighton Farms"), located in Loudoun County, Virginia, within the Eastern District of Virginia. (Compl. ¶ 10.) Defendant Creighton Enterprises, Incorporated ("Creighton Enterprises") is a Virginia corporation in the business of developing and managing real estate and the construction of homes. (Compl. ¶ 10.) Defendant Ritz is a limited liability company with its principal offices in Chevy Chase, Maryland and is in the business of developing, marketing and managing real estate worldwide. (Compl. ¶ 12.)

On January 30, 2007, Plaintiffs entered into a "Lot Purchase Agreement" for Lot 31 of the Development for

$1,150,000.00 (the "Lot 31 Purchase Agreement").  (Compl. ¶ 75.)
Pursuant to the Lot 31 Purchase Agreement, Plaintiffs paid to
Creighton Enterprises a deposit of $150,000.00 for Lot 31 (the
"Lot 31 Deposit").  On or about February 2007, Plaintiffs sought
to combine a neighboring Development lot ("Lot 30") with Lot 31.
(Ritz's Mem. Facts ¶ 2; Compl. ¶ 78.)  On March 3, 2007,
Plaintiffs signed "The Ritz-Carlton Golf Club, Creighton Farms
Estate Site Purchase Agreement" for Lot 30, Section III in the
Subdivision for $850,000.00 (the "Lot 30 Purchase Agreement").
(Ritz's Mem. Facts ¶ 2; Compl. ¶ 80.)   Pursuant to the Lot 30
Purchase Agreement, Plaintiffs paid to Juno a deposit of
$150,000.00 for Lot 30 (the "Lot 30 Deposit").  (Compl. ¶ 81.)
Defendants did not file a Statement of Record or HUD Property
Report with the Department of Housing and Urban Development
("HUD"), containing the disclosures required by the ILSFDA.
(Compl. ¶ 105.)  Further, neither of the Purchase Agreements
contained ILSFDA required provisions informing Plaintiffs of
their various rights of revocation under the Act and the
Plaintiffs were not provided with a HUD Property Report prior to
their purchase.  (Compl. ¶ 108.)

## II. Standard of Review

Summary judgment is appropriate if the record shows
that "there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."

3

Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409, 412 (4th Cir. 2009)(holding that summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."). The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v.* 477 U.S. at 248. To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248 (quotation omitted). "In assessing a summary judgment motion, a court is entitled to consider only the evidence that would be admissible at trial." *Kennedy v. Joy Technologies, Inc.*, 269 Fed. Appx. 302, 308 (4th Cir. 2008) (citing *Maryland Highways Contractors Ass'n, Inc. v. State of Maryland,* 933 F.2d 1246, 1251 (4th Cir. 1991) (noting that "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment")). The facts shall be viewed, and all reasonable inferences drawn, in the light

most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

## III. Analysis

Plaintiffs' Complaint states a number of causes of action against Defendants. Ritz's Motion for Summary Judgment addresses only Counts II and III of the Plaintiffs' Complaint, both of which allege ILSFDA violations. Defendant Ritz does not argue that it complied with the requirements of the ILSFDA; rather, it argues that the ILSFDA disclosure and reporting requirements did not apply to the Development because of two specific statutory exemptions. For the reasons below, the subdivision at issue is not exempt from ILSFDA's reporting and disclosure requirements. Thus, Ritz's Motion for Summary Judgment on this issue is denied.

### A. Statutory History

The Interstate Land Sales Full Disclosure Act was enacted as part of the Housing and Urban Development Act of 1968 and amended in 1979. *See* Pub.L. No. 96-153, Title IV, 93 Stat. 1122 (1979). The Act is "an antifraud statute utilizing disclosure as its primary tool with the principal purpose of protect[ing] purchasers from unscrupulous sales of undeveloped home sites." *Kamel v. Kenco/The Oaks at Boca Raton LP*, 321 Fed. Appx. 807, 809 (11th Cir. 2008) (citations omitted). ILSFDA

5

was designed to "prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.,* 426 U.S. 776, 778 (1978).

The Act makes it unlawful for a developer of a covered "subdivision" [2] to use of "any means or instruments of transportation or communication in interstate commerce, or of the mails . . . to sell or lease any lot unless a statement of record with respect to such lot is in effect . . . [and] a printed property report . . . has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee." 15 U.S.C. § 1703(a)(1). The "statement of record" must contain specific disclosures to the potential purchaser. 15 U.S.C. § 1705. The developer must provide the property report to the purchaser prior to executing the purchase agreement. 15 U.S.C. § 1703(a)(1)(B). If the developer fails to do so, the purchaser has the option of revoking her contract within two years of the date of signing. 15 U.S.C. § 1703(c). The purchaser's right of revocation must be acknowledged in their purchase agreement. 15 U.S.C. §

---

[2] The Act defines "subdivision" as land which is "divided into lots . . . whether contiguous or not*, for the purpose of sale or lease as part of a common promotional plan.*" 15 U.S.C. § 1701(3). As discussed above, the Development lots are part of a common promotional plan and thus constitute a "subdivision" within the meaning of the Act and its exemptions.

1703(c). "Congress designed ILSFDA to protect purchasers of land from fraud by requiring sellers to make certain disclosures in advance of a purchaser's signing the sales contract." *Ahn v. Merrifield Town Center Limited Partnership,* 584 F.Supp.2d 848, 853 (E.D. Va. 2008). "Through ILSFDA's disclosure requirements, Congress intended to ensure that, '*prior to purchasing* certain types of real estate, a buyer [is] apprised of the information needed *to make an informed decision*.'" *Id.* (citing *Markowitz v. Ne. Land Co.*, 906 F.2d 100, 103 (3rd Cir. 1990)(emphasis in original)).

### 1. Facial Applicability of ILSFDA

The Act applies to "subdivisions" which is defined as "any land . . . divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of *a common promotional plan*." 15 U.S.C. § 1701(3) (emphasis added). A "common promotional plan" is defined as "a plan, undertaken by a single developer or a group of developers acting in concert, to offer lots for sale or lease." 15 U.S.C. § 1701(4). Congress created a presumption under the Act that units in a development are considered part of a "common promotional plan" (and thus part of the same subdivision):

> where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous, or is known, designated or advertised as a common unit or by a common name, *such land shall be presumed, without regard to the*

7

*number of lots covered by each individual offering, as*
*being offered for sale or lease as part of a common*
*promotional plan.*

15 U.S.C. § 1701(4)(emphasis added); *See Pigott v. Sanibel*

*Development, LLC*,  576 F.Supp.2d 1258, 1276 (S.D.Ala. 2008).

The 164 lots here were contiguous, promoted using common

marketing materials by a common marketing staff, advertised

under a common name, and furthermore, Defendant Ritz concedes

that "[s]ince the inception of the Creighton Farms development

project, there has been a single, common promotional plan

covering the marketing and sales of lots." (Ritz's Mem. Facts ¶

4.)  The burden is thus on the Defendants to rebut this

presumption and show that that some statutory exemption or

exemptions apply to shield the Development from the requirements

of the Act.  They have not met this burden.

2.   Statutory Exemptions

        There are two types of exemptions from the

requirements of ILSFDA: (1) full statutory exemptions, set forth

in 15 U.S.C. § 1702(a), which discharge a developer from the

Act's disclosure and registration requirements as well as its

antifraud provisions; and (2) partial statutory exemptions, set

forth in 15 U.S.C. § 1702(b), which exempt a developer from the

Act's disclosure and registration requirements, but not its

anti-fraud provisions.  "Importantly, these exemptions [], must

be narrowly construed to ensure that Congress's "essential

purpose in enacting ILSFDA's remedial provisions is not frustrated." *Ahn*. 584 F.Supp.2d at 854(citing *Olsen v. Lake Country, Inc.,* 955 F.2d 203, 206 (4th Cir. 1991) (finding that ILSFDA exemptions, like all exemptions from remedial statutes, "are to be construed narrowly")); *See Markowitz v. Northeast Land Co.,* 906 F.2d 100, 105 (3rd Cir.1990) ("exemptions from remedial statutes such as the Act are to be narrowly construed"); *Harvey v. Lake Buena Vista Resort, LLC,* 568 F.Supp.2d 1354, 1362 (M.D. Fl. 2008)("Under federal law, exemptions under the ILSFDA must be narrowly and strictly construed"); *Pigott v. Sanibel Development, LLC,* 576 F.Supp.2d 1258, 1268 (S.D. Ala., 2008)(holding "when faced with an ambiguity regarding the scope of an exemption [in the Act], the court must interpret the exemption narrowly, in order to further the statutes' purpose of consumer protection")(citing *Taylor v. Holiday Isle, LLC,* 561 F.Supp.2d 1269, 1271 n. 5 (S.D. Ala.2008)); *See also Meridian Ventures, LLC v. One North Ocean, LLC,* 538 F.Supp.2d 1359 (S.D.Fla.2007)). It is through this lens that the Court views the Act's exemptions.

The two statutory exemptions at issue here are the "One Hundred Lot Exemption" (§ 1702(b)) and the "Sales to Builders Exemption" (§ 1702(a)). The "One Hundred Lot Exemption" set forth in 15 U.S.C. § 1702(b)(1) provides, in pertinent part:

> Unless the method of disposition is adopted for the
> purpose of evasion of this chapter, the provisions
> requiring registration and disclosure ... shall not
> apply to the sale or lease of lots *in a subdivision
> containing fewer* than one hundred lots which are not
> exempt under [§ 1702(a)].

15 U.S.C. § 1702(b)(1) (emphasis added).  The Development is comprised of 164 lots in total, thus does not comport with the requirements of the One Hundred Lot Exemption unless combined with additional exemptions.  To overcome the presumption that ILSFDA applies to the Development, Ritz must show that there are sixty-five (65) lots that qualify for an exemption under 1701(a), bringing the number non-exempt lots available in the Development to ninety-nine (99).  Ritz proposes to do this through 15 U.S.C. § 1702(a)(7), known as the "Sales to Builders Exemption."

The Sales to Builders Exemption states that "[u]nless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions of this chapter shall not apply to . . . (7) the sale or lease of lots to any person who acquires such lots for the purpose of engaging in the business of constructing . . . or for the purposes of resale."  15 U.S.C. § 1702(a)(7).  It is not disputed by the parties that there were one and sixty-four (164) lots available for sale at the Development.  (See Ritz's Mem. Facts ¶ 4.)  At the time the Complaint was filed, thirty-one lots had been sold, seventeen to

non-builders and only fourteen to builders.  (Ritz's Mem. Facts

¶¶ 7-8.)  On these facts alone, the one hundred lot exemption

does not apply to the Development.  Ritz argues, however: (1)

that when the developer intends that certain lots will be sold

to builders at some future date they must be considered "exempt"

under 15 U.S.C. § 1702(a)(7) and thus the One Hundred Lot

Exemption applies to the Development, and (2) that Ritz has

offered sufficient evidence so that no genuine issue of material

fact exists regarding this intent to sell to builders.  (See

Mem. at 4.)  To determine the meaning of these exemptions, the

Court will first turn to the plain language of the statute.

### B.  Plain Language

When engaging in statutory interpretation, the Court

must "first and foremost strive to implement congressional

intent by examining the plain language of the statute." *U.S. v.

Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010) (citing *United

States v. Passaro,* 577 F.3d 207, 213 (4th Cir. 2009)).  "[A]bsent

ambiguity or a clearly expressed legislative intent to the

contrary," this Court shall give a statute its "plain meaning."

*Id.* (citing *United States v. Bell,* 5 F.3d 64, 68 (4th Cir.

1993)).  A statute's plain meaning is determined by reference to

its words' "ordinary meaning at the time of the statute's

enactment." *Id.* (citing *United States v. Simmons,* 247 F.3d 118,

122 (4th Cir. 2001)).  This Court is mindful that in

"interpreting the plain language of a statute, we give the terms their ordinary, contemporary, common meaning, absent an indication Congress intended" the statute's language "to bear some different import." *Id.* (quoting *Stephens ex rel. R.E. v. Astrue,* 565 F.3d 131 (4th Cir. 2009) (internal quotations omitted)).

The plain language of the One Hundred Lot Exemption, 15 U.S.C. § 1702(b), is clear. ILSFDA's registration and disclosure requirements do not apply to "the sale or lease of lots in a subdivision *containing* fewer than one hundred lots which *are* not exempt under subsection (a)." *Id.* (emphasis added). The statute is drafted in the present tense. A Development will be exempt from ILSFDA's disclosure and reporting requirements if it is a "subdivision containing" fewer than one hundred lots which *are* currently exempt under § 1702 subsection (a).

The plain language of the subsection (a) exemption at issue here, the Sales to Builders exemption, states that "[u]nless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions of this chapter shall not apply to. . . (7) the sale or lease of lots to any person who acquires such lots for the purpose of engaging in the business of constructing . . . or for the purposes of resale." 15 U.S.C. § 1702(a)(7). The statute does not state that the

intended, but not yet completed, future sale or lease of a lot
to a builder is "exempt."  The plain language indicates that
§ 1702(a)(7) is intended to exempt only the actual "sale or
lease" of a lot, rather than the uncertain future sale.  Here,
the "sale or lease" of 65 lots "for the purpose of engaging in
the business of constructing" has not occurred.  Narrowly
construing the statutory text, this Court finds that by its
plain language, the Sales to Builders exemption does not
encompass hoped for future sales to builders "that have yet to
occur."  (See Mem. at 7) (describing the lots at issue as "sales
that have yet to occur.")  Such potential future sales are
merely speculative and are not "exempt" under § 1702(a)(7) as
they are not yet "sales."  As they are not "exempt under
subsection (a)," they do not bring the total non-exempt lots of
the Development below the 100 lot threshold necessary to qualify
for the One Hundred Lot Exemption under 15 U.S.C. § 1702(b).  By
its plain language, ILSFDA applies to the Development and the
exemptions at issue in this motion, by their plain language, do
not.

### C.   Extrinsic Evidence

Defendant Ritz asks the Court to look beyond the plain
language of the statute and argues that the Sales to Builders
Exemption applies because "[t]he plan for development and sale
of lots at 'The Estates of Creighton Farms' project originally

was to sell at least half, or 82, of what were then planned

total of 164 lots, to building contractors." (Ritz's Mem. at 5

citing sworn declaration of Peter Alpert (Exhibit 1 to its

Memorandum in Support of Ritz's Motion to Dismiss) ("Alpert

Dec.") ¶ 6.) Ritz's argument is premised on its interpretation

of HUD guidelines regarding ILSFDA, as well as recent case law

in a different district that has partially adopted Ritz's view.

Although the Court finds the plain language of the statute

dispositive, it will nonetheless explore this line of argument.

### 1.   Congressional Intent

Congress's purpose in enacting ILSFDA provides a

compelling reason why speculative "future sales" of certain lots

to builders should not be considered "exempt" for purposes of

applying the One Hundred Lot Exemption to developments that are

otherwise subject to ILSFDA's disclosure and reporting

requirements. Congress enacted ILSFDA in the wake of "wholesale

interstate land fraud" perpetrated on a number of "unsuspecting

and ill-informed investors and consumers." *Ahn*, 584 F. Supp.2d

at 853 (citing James L. Olivier, Note, *Beyond Consumer

Protection: The Application of the Interstate Land Sales Full

Disclosure Act to Condominium Sales,* 37 U. Fla. L. Rev. 945, 946

(1985) (citing *Interstate Land Sales Full Disclosure Act, 1966;

Hearings on S. 2672 Before the Subcomm. on Securities of the S.

Comm. on Banking & Currency,* 89th Cong., 2d Sess. (1966)); *see*

*also* William P. Sklar & Jennifer L. Dolce, *The Interstate Land Sales Full Disclosure Act's Two-Year Completion Exemption,* 73-FEB Fla. B.J. 56 (1999); 118 A.L.R. Fed. 647 (1994)).

Congress titled the Act, the Interstate Land Sales Full Disclosure Act, and as the name implies, Congress intended it to protect purchasers of undeveloped land through disclosure; prohibiting fraud in land sales "by requiring sellers of land, *inter alia*, to make certain disclosures *in advance of a purchaser's signing the sales contract*." *Ahn*, 584 F.Supp.2d at 853 (emphasis added); See 17 U.S.C. §§ 1701-1720. The provisions of the Act primarily impose duties on sellers prior to the signing of a purchase agreement and create protections for purchasers at the time the purchaser enters into the contract. Prior to the sale of a lot, Developers must file a public "statement of record" (§§ 1703(a)(1)(A), 1704-1706), submit a property report to the purchaser in advance of their entering into a purchase agreement (§§ 1703(a)(1)(B), 1707), and may not advertise or promote the property to the potential purchaser in a way contrary to the information disclosed in the report (§ 1703(a)(1)(D)). All of these strictures are imposed prior to the sale of any lot to purchaser and are designed to provide purchaser with the critical information necessary to his decision to enter into a purchase agreement.

Prior to the purchase of a lot, a potential purchaser has certain rights under ILSFDA to protect them from making an uninformed decision. The purchaser has a right to know, prior to signing the purchase agreement, that the agreement can be revoked as of right under certain circumstances. (See 15 §§ 1703(b), 1703(c)) These provisions reflect "Congress's recognition that the need for buyer protection is critical prior to the time the buyer makes the decision to sign and incur obligations." *Ahn*, 584 F.Supp.2d at 854-855 (holding that the timing of a specific exemption begins to run at the time the purchaser signs the purchase agreement, rather than at some later time when the developer ratifies the agreement).

It follows that if the duties and rights imposed by the Act vest prior to (or contemporaneously with) entering into a purchase agreement, the specifically delineated exemptions should also be examined at the time the parties enter into the purchase agreement. A development is exempt from ILSFDA if it is a "subdivision *containing* fewer than one hundred lots which *are* not exempt under subsection (a)." 15 U.S.C. § 1702(b)(1). When determining whether or not the subdivision is one "containing fewer than one hundred units," the number of non-exempt lots in the subdivision should be determined contemporaneously with when the purchaser enters into the purchase agreement for the lot in the subdivision. Similarly,

when determining which lots should be considered non-exempt under subsection (a) the Act specifically exempts "the sale or lease of lots to any person who acquires such lots for the purpose of engaging in the business of constructing. . . . or for the purposes of resale." 15 U.S.C. § 1702(a)(7). Congress designed ILSFDA's disclosure and reporting requirements, and the right of a potential purchaser to be made aware of these disclosures and their rights of revocation, to take effect prior to and at the time of the signing of a purchase agreement. See *Ahn,* 584 F.Supp.2d at 853. Determining whether or not these rights and duties exist based on certain exemptions must also be determined at this time so that Congress' intent is not frustrated.

If Ritz's reading of the statute was correct, a purchaser's rights to full disclosure of the rights of revocation and complete information in the form of the property report could be vitiated simply by a developers' stated (but unfulfilled) intention to later sell sufficient lots to builders, therefore bypassing Congress' intent to protect potential purchasers through pre-purchase disclosure. For example, if a development contained 150 lots for sale and the developer claimed an intention to sell 51 lots to builders, the purchaser of the first lot, "Lot 1," would not be notified of his right of revocation with seven days (per § 1703(b)) or two

years (per § 1703(c)), nor would purchaser be provided with the required property report *prior* to entering into the agreement (per §§ 1703(a)(1)(B), 1707). Three years later, if the developer had failed to sell any lots to builders and sold the 100th non-exempt lot to an individual homebuyer, the development would be subject to ILSFDA. The purchasers of the first 99 lots, however, would not have benefited from the full disclosure and reporting requirements of the Act prior to purchasing their lots, nor would they have been able to exercise the rights of revocation that Congress intended to protect them. See *Flint*, 426 U.S. at 778; *Ahn*, 584 F.Supp.2d at 853. This reading of the statute goes against its plain meaning as well Congress's clear intent to require developers to provide "full disclosure" of information to potential purchasers, submit a property report to HUD, and alert purchasers to their rights of revocation *prior* to the purchaser entering a purchase agreement.

The alternative reading of the statute informed by its plain meaning and faithful to Congress's intent is that: (1) ILSFDA presumptively applies to subdivisions; (2) the Development is a subdivision; (3) The Development has 164 Lots; (4) only 14 exempt Lots have been sold; (5) the subdivision now contains 150 lots not yet "exempt under subsection(a)"; thus (6) the one hundred lot exemption does not apply. If at some later time, the "sale or lease" of a 65th lot "for the purposes of

18

construction" did occur, the development would be exempt from ILSFDA as it would no longer be a "subdivision *containing* fewer than one hundred lots which *are* not exempt under subsection(a)" and thus be exempt from ILSFDA.  See 15 U.S.C. § 1702(b).

As previously held in this District, "Congress intended to ensure that, '*p*rior to purchasing certain types of real estate, a buyer [is] apprised of the information needed *to make an informed decision.*'" *Ahn*, 584 F.Supp.2d at 853 (quoting *Markowitz v. Ne. Land Co.,* 906 F.2d 100, 103 (3d Cir.1990) (emphasis in original); See also *Cost Control Mktg. & Mgmt., Inc. v. Pierce,* 848 F.2d 47, 48 (3d Cir.1988); *Law v. Royal Palm Beach Colony, Inc.,* 578 F.2d 98, 99 (5th Cir.1978) (noting that ILSFDA "ensures that a buyer, *prior to purchasing* certain kinds of real estate, is informed of facts which will enable him to make an informed decision about purchasing the property" (emphasis added)); 54A Am. Jur. 2d Monopolies and Restraints of Trade § 1315.)  Exemptions to ILSFDA must be narrowly construed, and the broad reading of these exemptions that Ritz proposes would serve to delay or destroy the rights and obligations created by ILSFDA for non-exempt subdivisions, going against the clear intent of Congress.  The alternate reading outlined above would enforce the disclosure and reporting requirements of ILSFDA and narrowly construe the exemptions ensuring that Congress's intent is followed.

2.  Administrative Guidelines

Ritz also argues that its interpretation of the Sales
to Builders and One Hundred Lot Exemption is supported by
guidelines published by HUD.  As an initial matter, this Court
must determine what weight to give the HUD guidelines.  "Because
HUD is the agency responsible for enforcement of ILSFDA, its
regulations 'are entitled to *Chevron* deference as an
authoritative interpretation of the statute unless. . . it
appears form the statue or its legislative history that the
agency interpretation is not one that Congress would have
sanctioned.'"  *Ahn*, 584 F.Supp.2d at 855 n.15, (citing *Danilov
v. Aguirre,* 370 F.supp.2d 441, 444 (E.D. Va. 2005); *Chevron
U.S.A. Inc.*, v. *Natural Res. Def. Council*, *Inc.*, 467 U.S. 837
(1984).  On the other hand, "an administrative agency's
guidelines are interpretive rules entitled to "some deference"
in the judicial interpretation of a statute within the Agency's
purview.  *Ahn*, 584 F.Supp.2d at 856 n. 18 (citing *Reno v. Koray,*
515 U.S. 50, 61 (1995)(holding that an internal agency guideline
is entitled to "some deference" so long as it is a "permissible
interpretation of the statue").  A court in this District has
already determined that the HUD Guidelines at issue here, (61
Fed. Reg. 13596, 13604 (March 27, 1996)), are "interpretive
rules" and should simply be given "some deference" in the
Court's interpretation of the statute.  *Ahn*, 584 F.Supp.2d at

856 n. 18 (citing *Reno v. Koray,* 515 U.S. at 61); *see also*

*Christensen v. Harris County*, 529 U.S. 576, 587 (2000)(noting

that enforcement guidelines, are "entitled to respect . . . but

only to the extent that those interpretation have the power to

persuade")(internal citations omitted).  Similarly, this Court

will give the guidelines cited by Ritz some deference here;

however, the language of the guidelines cannot trump the

language of the statute.

Ritz's argument hinges on two portions of the HUD

guidelines.  First, the guidelines give an example of the

application of the One Hundred Lot Exemption.   In the example,

a subdivision containing 130 lots would qualify "if at least 30

lots are sold in transactions that are exempt."  61 FR at 13604.

The guidelines state that the exemptions may be "either past or

future sales" and that "this exemption for prior and future

sales and might result in prior sales being voidable at the

purchaser's option."  *Id.*  Second, the guidelines elaborate on

the example above stating that the thirty exempt lots could

qualify through a combination of exemptions; twelve lots with

completed "residential structures" on them, nine sold to

building contractors, and "at least nine lots were reserved for

either the construction of homes by the developer or for sales

to building contractors.  The reserved lots need not be

specifically identified."  *Id.*

Ritz also cites a resent Southern District of New York decision, *Bodansky v. Fifth on the Park Condo*, Nos. 09cv4651 (DLC), 09cv6433(DLC), 2010 WL 334985 (S.D.N.Y., Jan. 29, 2010), where the court, citing to these guidelines, found that a 160 unit development did not need to be a "subdivision" containing fewer than 100 non-exempt lots at the time the plaintiff's purchase agreement was signed. Instead the court held that, as a temporary certificate of occupancy had been issued for the development, "the remaining 70 [unsold] units in the Condominium will necessarily qualify for the Improved Lot Exemption pursuant to § 1702(a)(2)." *Bodansky*, 2010 WL 334985 at *8. While distinct from the instant case because the disposition of the 70 unsold condominium units had been determined but not yet accomplished, the *Bodansky* court did find that such a "future sale" constituted an "exempt" unit for purposes of applying the One Hundred Lot Exemption. This Court disagrees with the *Bodansky* court's reading of the statute. Furthermore, the decisions of courts in other Districts are not binding upon this Court. This Court is more persuaded by the logic of the Eastern District of Virginia case of *Ahn*, then that of the court in *Bodansky*.

While relevant to the Court's analysis, the language of HUD's guidelines relevant to the application of the One Hundred Lot Exemption does not supplant the language of the

applicable exemptions themselves.  Congress chose not to draft
the exemption to take into account the "past or future sale [or
lease]" of exempted lots but instead only exempted "subdivisions
*containing* fewer than one hundred lots which *are* not exempt
under subsection (a)."  15 U.S.C. § 1702(b).  Congress could
easily have chosen to exempt "subdivisions containing *or that in
the future will contain* fewer than one hundred lots which are
not exempt under subsection(a)."  It did not do so.  In drafting
the Sales to Builders exemption, Congress chose to only exempt
the "sale or lease" of lots to builders not lots that were
merely "reserved" for builders or that the developer intended
to, or hoped to, later to sell to builders.  15 U.S.C.
§ 1702(a).  Again, Congress could have drafted a broader
exemption applying to "those lots reserved by the developer for
sale or lease to any person who acquires such lots for the
purpose of engaging in the business of construction . . . ."
Congress did not do so.

     While this Court gives some deference to the HUD
guidelines, the administrative agency's guidance is not
determinative here.  The Court must "narrowly construe" the
exemptions so that Congress's "essential purpose in enacting
ILSFDA's remedial provisions is not frustrated."  *Ahn*, 584
F.Supp.2d at 854(citing *Olsen v. Lake Country, Inc.,* 955 F.2d
203, 206 (4th Cir. 1991) (finding that ILSFDA exemptions, like

                              23

all exemptions from remedial statutes, "are to be construed narrowly")).  The Act was designed to "prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.,* 426 U.S. 776, 778 (1978).  This Court will not ignore the language of the statute and abrogate Congress's intent for full disclosure to individuals *prior* to their purchase of undeveloped real estate by broadly construing the language of the statutory exemptions at issue here.[3]

> 3.  <u>Other Considerations</u>

In addition to the reasons discussed above, Ritz's argument fails on alternative grounds.  Accepting Ritz's interpretation of the statutory exemptions as correct, there remain two genuine issues of material fact that would preclude summary judgment at this stage.  First, there is a genuine issue of material fact regarding the existence of a plan to sell half of the lots in the development to builders.  Defendant Ritz offers the sworn testimony of Peter Alpert in support of this point.  Alpert states that the plan for "'The Estates of

---

[3] While this Court only gives these guidelines "some deference" it would reach the same determination using *Chevron* deference as "it appears from the statute . . . that the agency's interpretation is not one that Congress would have sanctioned."  *Danilov v. Aguirre,* 370 F.Supp.2d at 444 (E.D. Va. 2005)(citing *Chevron U.S.A. Inc.,* v. *Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984).

Creighton Farms' project originally was to sell at least half, or 82, of what were then planned total of 164 lots, to building contractors." (Ritz's Mem. at 5 citing Alpert Dec. ¶ 6.) Defendant Ritz also offers a May 2005 Opinion Letter from Defendant Juno's counsel to a potential investor stating that "it is the Developer's intent to sell at least 82 of the 164 lots . . .to builders . . . . In the event there are at least 65 sales to builders, it is our opinion . . . that the [Development] qualifies for [the One Hundred Lot] exemption."[4] (Alpert Dec. ¶ 6, Ex. 1.) Mr. Alpert's knowledge of the original "plan" is derived from due diligence performed subsequent to the Plaintiffs' purchase, not contemporaneous with the creation of the plan. The letter addresses what Defendants might do, but is not a statement of the Defendants themselves, nor is it sufficient to definitively resolve the issue of fact at this stage of litigation. Other than disputing the existence of such a plan (See, Opp. at 19-20), without discovery, Plaintiffs are in no position refute these claims.

Furthermore, "[i]f a developer elects to take advantage of an [ILSFDA] exemption, the developer is responsible for maintaining records to demonstrate that the requirements of the exemption have been met." 24 C.F.R. § 1710.4(d). No such records have been submitted to this Court. Even if this Court

---

[4] The Court notes that the Opinion Letter appears to indicate that the 65 sales to builders must be completed before the exemption applies.

were to adopt Ritz's view of the relevant ILSFDA exemptions, which it does not, summary judgment would be precluded as a genuine issue of material fact exists regarding the existence of a "plan" to sell half of the lots, in the Development to builders, and without discovery on this issue, summary judgment is not appropriate.

Additionally, both of the exemptions put forward by Ritz can apply "unless the method of disposition is adopted for the purpose of evasion [of ILSFDA]." 15 U.S.C. § 1702. Specifically, courts have found that if "a seller's method of disposition is adopted for the purposes of evading the ILSFDA's requirements, the seller is not entitled to any exemption found in section 1702." *Gentry v. Harborage Cottages-Stuart, LLP,* 602 F.Supp.2d. 1239, 1247 (S.D.Fla. 2009). Plaintiffs argue that the sale of lots to co-defendant Creighton Farms, LLP, was merely a pass-through designed to evade the ILSFDA disclosure requirements. (Opp. at 16.) In support of this argument, Plaintiffs offer what pre-discovery factual evidence they can. They note that the lot they purchased from Defendant Creighton Farms (a builder), was only sold to Defendant Creighton Farms after the Plaintiffs had expressed interest in purchasing it and that the deeds conveying the lot to the "builder" and from the "builder" to the Plaintiffs were filed contemporaneously. (Opp. at 16.) Additionally, Plaintiffs submit a deed for a separate

lot, sold by a "builder" in which the deed was never put in the "builder's" name. The deed states that Defendant Juno sold the lot to builder Galileo, however, Galileo requested that Juno deed the lot directly to the individual home buyer "in lieu of to Galileo. . . ." (Opp. at 16; Ex. C.) The *Gentry* court determined that, at the summary judgment stage, a developer must establish a legitimate business purpose through "some factual evidence demonstrating that the method of disposition has some bona fide, real world objective that manifests a legitimate business purpose." *Gentry* 602 F.Supp.2d at 1249. Here, there is a genuine issue of material fact regarding whether or not the actual sales to builders, as well as the purported plan to sell at least half of the lots to builders where simply a "method of disposition [] adopted for the purpose of evasion of this chapter." Summary Judgment would not be appropriate at this time.

## IV. Conclusion

As the Development is a subdivision containing more than one hundred non-exempt lots, 15 U.S.C. § 1702(b)(1) does not apply. Defendant Ritz's Motion for Partial Summary Judgment as to Counts II and III is denied. An appropriate Order will issue.

|                        | _____/s/_____ |
|------------------------|----------------------------------------|
| March 30, 2010         | James C. Cacheris                      |
| Alexandria, Virginia   | UNITED STATES DISTRICT COURT JUDGE     |